Ernest E. GREEN

v.

**ORION SHIPPING AND TRADING CO., Inc., Respondent,**

and

Standard Maritime Supply Co., Inc.,

and

The Billings & Spencer Co., Respondents Impleaded.

No. 3728.

United States District Court
D. Maryland, Admiralty Division.
March 21, 1956.

negligent failure to supply proper medical attention; the third is for maintenance and cure. Respondent has filed a petition under the 56th Admiralty Rule, 28 U.S.C.A., impleading Standard Maritime Supply Co., Inc., the vendor, and The Billings & Spencer Co., the manufacturer of the wrench, on grounds of breach of warranty and negligence, respectively; and respondent and impleaded respondents contend that a major portion of the permanent disability is due to a second fall, on December 3, 1954, on the Orion Clipper, which they say was not caused by the original injury nor by any negligence on the part of respondent.

The findings of fact and conclusions of law on the issues of seaworthiness, negligence of the ship, of the vendor and of the manufacturer of the wrench, breach of warranty, assumption of risk and contributory negligence will be set out together first; the findings of fact and conclusions of law on the issue of damages, including the propriety of the treatment afforded libellant and the nature, cause and result of the second injury, will follow.

## I.

### A. Facts—The Accident.

Herbert L. Grymes, Baltimore, Md., for libelant.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (Southgate L. Morison and Randall C. Coleman, Jr., Baltimore, Md., of counsel), for respondent.

Jesse Slingluff, Jr., Baltimore, Md., for respondents impleaded.

THOMSEN, Chief Judge.

Libellant, who was first assistant engineer on the supertanker Orion Star on March 3, 1954, has filed a libel in personam against Orion Shipping and Trading Co., Inc., the owner of that vessel, claiming permanent injuries to his left foot and ankle resulting from a fall caused by the breaking of the 1¼″ box on a double-end box wrench which he was using on that day. The first cause of action charges unseaworthiness due to the allegedly defective wrench and negligence of respondent in failing to inspect and test the wrench; the second charges

Libellant, a marine engineer, followed the sea until 1936, rising to first assistant engineer. From 1936 to 1950 he worked ashore as a stationary engineer and served four years as chairman of the Maryland State Board of Examining Engineers. In 1950 he resumed seafaring and in October, 1953, signed on as second assistant engineer of the supertanker Orion Star, which was being built and outfitted at the Bethlehem Sparrows Point Shipyard.

The Orion Star was a good ship, but libellant had little respect for her captain and chief engineer. The first assistant was discharged in November, 1953, during the maiden voyage, and libellant became first assistant at that time. The ship made several trips carrying oil from Saudi Arabia to Sasebo, Japan, and on March 3, 1954, was alongside the dock at Ras Tanura, Saudi Arabia, scheduled to sail at 5:00 P.M.

One or more of the tubes of the starboard boiler economizer had been leaking; shoreside welders had failed to correct the condition; and following a conference between the captain, the chief engineer and libellant, the chief ordered libellant about 10:30 A.M. to blank off the starboard economizer. As first assistant engineer libellant was in charge of the engine room, including all tools, equipment and personnel. He ordered Burns, Mason and Easterling, second assistant engineer, second pumpman, and wiper, respectively, to do the work, and went below himself to lend a hand.

The job involved inserting blanks between the flanges of two connections on the line feeding the economizer, blocking off that line so that water would flow directly to the boiler. A blank is a steel plate perforated with a sufficient number of holes to accommodate the bolts whose function usually is to hold the two flanges tightly together, and whose nuts press the two flanges against the blank after it has been inserted.[1]

The economizer sits on top of the boiler, its tubes enclosed by vertical plates which rise to a height of about 7 feet above the top of the boiler. The flanges between which the blanks were to be inserted are located outside one of these vertical plates or walls of the economizer, which rises from the top surface of the boiler about 18 inches from where the upper half of the boiler drum meets the top surface of the boiler. The lower half of the drum is within the boiler itself. The top half of the drum, which is cylindrical in shape, rises about 3 feet above the top surface of the boiler. The two connections into which the blanks were to be inserted are about 5 feet apart diagonally, the lower one being about 4 feet above the top surface of the boiler, and the upper one about 6 feet above the top surface of the boiler and about 3 feet above the top of a large pipe on which libellant sat to do his part of the work.

Each of the bolts holding the flanges together called for two 1¼″ nuts. The men took with them a double-end box wrench, with a 1¼″ box at one end and a 1⁵⁄₁₆″ box at the other, a 1¼″ open-end wrench, and a hammer with which to drive the blanks between the flanges and to strike the handle of the open-end wrench in the last phase of tightening the nuts. Burns and Easterling worked together on the lower connection, libellant and Mason on the upper, passing the tools back and forth. Mason loosened the nuts, removed the bolts, inserted the blanks, replaced the bolts and tightened the lower nuts, using the open-end wrench. Libellant then began to tighten the nuts over the top flange of the upper connection, and was going over them a second time with the double-end box wrench, putting some strain on them. A box wrench is a tool customarily used for that purpose. He could not tighten those upper nuts by standing on the top of the boiler in the 18-inch strip between the economizer and the drum, because the flange would have been above his head. He therefore sat on a large pipe, about 2 or 3 feet below the flange, and braced his right foot on the top of the drum. While he was sitting in that position, pulling with both hands on the shaft of the double-end box wrench, the wrench broke obliquely across the 1¼″ box which was grasping the nut; libellant fell backwards, his left foot caught between two pipes, and he hung by that foot until he was released by his fellow workers. He shouted "Look at this", or words to that effect, before dropping the wrench, which slid off the offset of the boiler and fell 30 feet to the steel deck below.

The space in which libellant was working was a thicket of pipes, with a grating

1. The word "flange" means a rib or rim, for strength, for guiding, or for attachment to another object. In this case the flanges were on the ends of the pipes forming the connection. During the trial, however, the word "flange" was used to refer to the entire connection; the "upper flange" and the "lower flange" in the transcript mean the upper and lower connections on the economizer line into which blanks were inserted horizontally between the flanges of the connecting pipes.

about 18 inches above the top flange; but the position which libellant assumed was not as cramped as would appear from photograph No. 14, since the man in that photograph, one of respondent's advocates, is 6' 4" tall, while libellant is only 5' 7" tall. The suggestion of respondent's advocate that libellant should have set up a horse on the 18-inch strip of level surface on top of the boiler, run boards from the horse to the top of the drum and worked standing on the boards, was not practical. The horse would have to be built by the ship's carpenter on overtime, which could only be ordered by the chief engineer; and this was a rush job to get the ship ready to sail that afternoon. Moreover, standing on any staging which could have been set up in that location would have been at least as dangerous as the position which libellant actually assumed. Libellant was not performing the work in a negligent manner nor using an improper tool at the time of the injury.

## B. Facts—The Wrench.

The wrench was a double-end box wrench, 18½" long, with a 15" shaft between the boxes, one of which fitted a 1¼" nut and the other a 1⅝6" nut. It was manufactured by Billings & Spencer Co., one of the respondents impleaded, which produces nearly 500,000 wrenches of different types per month. The method of manufacture and the various inspections and tests made in the process were described by the assistant superintendent of that company and discussed by a metallurgist. I find that reasonable care was used in the manufacture of the wrench; and although it is not impossible that the wrench was defective when it left the hands of the manufacturer, it is highly improbable, and there is no evidence of any defect at that time.

The wrench was sold and delivered by the manufacturer to Standard Maritime Supply in November, 1953, and a few days later was sold by that company to respondent, and delivered through the shipyard to the ship, along with many other wrenches. Libellant had the box

of wrenches unpacked; they were checked by him, the third assistant engineer and the junior third. Neither libellant nor anyone else employed by respondent inspected or tested the wrenches at the time they were delivered. No such inspection or testing is customary or would be practical. Libellant placed one complete set of wrenches on a tool board in the machine shop, and stored the spares in boxes in the storeroom, from which he would issue wrenches for replacement if and when needed.

Box wrenches are of relatively light construction and should not be struck by a hammer at any time. Such hammering might cause a slight fracture, not visible in ordinary use, which would greatly weaken the wrench and make it likely to break. There were no striking wrenches aboard the Orion Star, i. e., wrenches specially designed to be struck with a hammer, but there were open-end wrenches of all sizes on the tool board, including one 1¼" open-end wrench, and it was and is customary for engine room personnel to strike the handles of open-end wrenches when loosening or tightening nuts.

The wrench used by libellant at the time of the accident was offered in evidence. It was sent by the captain of the Orion Star to the United States in July, 1954, but there was no evidence to account for what happened to the wrench between March 3, 1954, and July, 1954. At some time before July, 1954, someone had ground or filed off the broken ends of the 1¼" box, so that the original fractured surface was entirely lost.

At the trial the 1⅝6" box gave evidence of having been struck many times with a hammer; and the end of the shaft near the broken box was scarred as though a pipe had been used to increase the length of the shaft and thus increase the leverage. Since these scars are near the broken (1¼" box) end, it is a likely inference that a pipe had been run over the other end to increase the leverage while the 1¼" box was around a nut one or more times during the several months it was in use before it broke. Any member of

the crew, from the deck and steward departments as well as from the engine room, might have used the wrench from time to time. The few who testified said that they had never hammered a box-end wrench.

The testimony with respect to the condition of the wrench in question on March 3, 1954, is unsatisfactory. Libellant did not check to see whether there were any marks on the wrench before he used it; but he noticed no defect in the wrench, and there is no evidence that there was any visible defect in the wrench before the accident. Although the dents and scars referred to above probably were present at that time, those scars were not sufficient to charge a reasonably prudent man of libellant's experience with notice that the wrench had become dangerously defective.

A competent metallurgist examined the wrench in January, 1956. Following a visual examination and photographing, the wrench was tested for strength, hardness, mechanical or metallurgical defect, cleanliness and structure. These tests required the shaft of the wrench to be cut in two, a small piece to be gouged out of one part of the shaft, and tiny bits of metal to be removed from the remaining box end. The 1 5/16″ box sustained a torque load of 15,420 inch/pounds, whereas Federal specifications GGG–W–636a require a minimum of only 8,000 inch/pounds for a box of that size. The minimum for a 1 1/4″ box is 7,250 inch/pounds. Upon completion of the Rockwell test, the wrench showed no evidence of permanent set or permanent bending. The hardness of the metal in the wall of the 1 5/16″ socket (box), as measured by the Rockwell instrument, was Rockwell C47–48. Federal specifications require that the Rockwell hardness be between C40 and C55. Although it is possible to have a different quality at two ends of a box-end wrench, it is highly improbable. Under microscopic examination the internal cleanliness of the steel was found to be satisfactory. The metallographic report disclosed a normal microstructure for a properly forged and heat-treated steel in the foregoing hardness range. The chemical analysis was also satisfactory.

I find that the wrench was not defective when it was delivered by the vendor to the ship. I further find that the wrench had been weakened by hammering or other mistreatment before the accident, and was defective at that time.

### C. Conclusions in re Liability

■ The defective wrench rendered the ship unseaworthy, irrespective of respondent's knowledge or negligence, since it was not a reasonably safe tool or appliance. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Petterson v. Alaska S. S. Co., 9 Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Poignant v. United States, 2 Cir., 225 F.2d 595. This is not a case like Baccile v. Halcyon Lines, D. C.E.D.Pa., 89 F.Supp. 765, reversed 187 F.2d 403, reversed Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, on other points, where the mere fact that a plank gave way was held to be not sufficient evidence that the plank was defective; the judge in that case found that there was a permissible inference that the plank gave way because it was used in a manner in which it was not intended to be used. In the case at bar, I have found as a fact that the wrench was being used in a customary manner at the time of the accident.

Respondent was not negligent in failing to inspect or test the wrench more thoroughly than it was checked by libellant and the men under him at the time it was delivered to the ship.

■ Assumption of risk is no defense to libellant's claim based on unseaworthiness: (1) because as a matter of law the defense is invalid; Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Dixon v. United States, 2 Cir., 219 F.2d 10; The Calvert, 4 Cir., 51 F.2d 494; Silk v. United States, War Shipping Administration, D.C.E.D.Pa.,

79 F.Supp. 579; and (2) because respondent did not meet the burden resting on it to show that libellant voluntarily and knowingly used a defective wrench.

The question whether libellant was guilty of contributory negligence in using the wrench is not entirely free from difficulty. Socony Vacuum Oil Co. v. Smith, supra; Dixon v. United States, supra; Walker v. Lykes Bros. S. S. Co., 2 Cir., 193 F.2d 772. Libellant was in charge of the wrenches and other tools, but he was not charged with a duty of carefully inspecting all of the wrenches every day or even every week. There was no opportunity or duty to make a careful inspection when the wrench was handed to libellant in the boiler room. Moreover, there is no evidence that there was any visible defect in the wrench at that time. It may be inferred that a careful inspection of the wrench shortly before the accident would have shown the dents and scars referred to in the findings of fact, but I have found as a fact that those dents and scars were not sufficient to charge a reasonably prudent man of libellant's experience with notice that the wrench had become dangerously defective.

The burden of proof on the issue of contributory negligence was on respondent. The ship has had the wrench ever since the accident; it had the opportunity to preserve the wrench in the condition it was in immediately after the accident, so that its condition at that time could be observed. However, the ship did not preserve the wrench in that condition, but permitted someone to grind or file the broken end, and apparently permitted the continued use of what remained of the wrench. Libellant was removed from the ship ten days after the accident, and was in bed in his quarters during the intervening period. He had no opportunity to conduct a search for the wrench and the broken piece.

We may assume that Standard Maritime Supply sold the wrench to respondent under implied warranties of merchantable quality and reasonable fitness for the purpose intended. We may also assume that in a proper case Billings & Spencer Co., the manufacturer of the wrench, might be liable to the ship for indemnity. Pierce v. Ford Motor Co., 4 Cir., 190 F.2d 910. But respondent has failed to prove that the wrench was defective when it was delivered to the ship. The burden of proof on this issue was on respondent, which by failing to preserve the wrench in the condition it was in immediately after the accident, destroyed its opportunity to show that there was some latent defect in the 1¼" box which could be charged to the manufacturer or the supplier. Under the evidence, it is at least equally probable that the wrench was weakened by hammering or other mistreatment after it came onto the ship. No case has been proved against the manufacturer or the vendor. Whitin Machine Works v. United States, 1 Cir., 175 F.2d 504; Hentschel v. Baby Bathinette Corp., 2 Cir., 215 F.2d 102; Pontifex v. Sears, Roebuck & Co., 4 Cir., 226 F.2d 909; Coastal Tank Lines v. Carroll, 205 Md. 137, 106 A.2d 98; Bohlen, Studies in the Law of Torts, 636 et seq.

II. Facts—Injury and Damages.

There is conflict between the testimony of libellant and the contents of some of the reports which were offered in evidence. There is also conflict between the several medical reports and witnesses as to the nature of the injuries. Where such conflict exists, I accept the report of Dr. Cameron of Singapore and the testimony of Dr. Weinberg and Dr. Voshell as against all conflicting statements and reports.

Immediately after the accident libellant's left foot was badly swollen; he was given aspirin by one of the ship's officers; the doctor of the American Arabian Oil Company in Ras Tanura was called; and libellant was taken on a stretcher to that company's clinic, where he was seen by two doctors and an X-ray was taken which showed no fracture. His condition was diagnosed as a "sprained left ankle". He did not wish to go to the hospital at Dhahran, 80 or 90 miles away, but wished to return to the ship,

which sailed at 5:00 P.M., six hours after the accident. Libellant's ankle was strapped and he was returned to the ship, with the following recommendation: "Off duty & foot elevated for at least 8 days. If adhesive gets tight, change it. Recheck in next harbor by M.D."

Libellant remained in bed in his quarters for ten days. His ankle became progressively more painful, and at his request the captain removed the bandage. Various efforts to relieve the pain were attempted, which were futile but not blameworthy. Although the ship had not expected to touch at Singapore, the captain radioed ahead to be met there by a doctor. The ship anchored 6 or 7 miles out; libellant was transferred to the ship chandler's launch, which he called "a bumboat", his principal complaint being that only "foreigners" were aboard. This boat transferred him to the doctor's launch at the safe anchorage and he was taken to a hospital at Singapore. He was examined there by a number of doctors, including Dr. J. A. P. Cameron, who reported:

"Mr. Green was treated in a temporary P.O.P. cast during the week-end. I re-examined his ankle to-day under Pentothal anaesthesia and confirmed the extent of the ankle injury.

"He has rupture of the Lat. ligaments with instability of the Talus (L) in the ankle joint. There is no evidence of a bony injury. X-rays were taken to show the position during full inversion of the ankle.

"A fresh P.O.P. cast has been applied. This should be retained for two months and thereafter physiotherapy.

"It is unlikely that he will be able to return to work for about three months.

"I would advise his early return to the U.S.A."

Arrangements were made for him to return to the United States on the S.S. Steel King, which was scheduled to arrive at San Francisco in about two weeks. Unfortunately, the Steel King was rerouted and returned via Indonesia, Ceylon, India, Djibouti, Suez, Gibraltar and Halifax, consuming 60 days. Although this trip was uncomfortable for libellant in view of the cast which extended above his knee, it did not prevent any treatment recommended by Dr. Cameron. Upon arrival in Baltimore, he went to the United States Public Health (Marine) Hospital on May 13, 1954, where he was treated first as an outpatient. The cast was removed, an X-ray showed minimal soft tissue swelling over the lateral malleolus, and his condition was diagnosed as a sprained left ankle. A fall at home on crutches required his admission to the hospital on May 26, 1954, but he left the hospital against medical advice two days later. He went to Dr. Glass, his own doctor, who arranged for outside physiotherapy, although he admitted there was nothing wrong with the treatment libellant had been receiving at the Marine Hospital. Libellant's foot improved, and after a conference between Dr. Glass and Dr. Voshell, an orthopedic surgeon who had examined libellant for respondent, the doctors agreed on August 4, 1954, that libellant should return to work, as he wished to do, although his foot was not completely healed. The anatomical disability at that time was about 15%. He was supplied with a laced leather ankle brace, reinforced with steel stays. He was accepted by respondent's doctor and signed on as third assistant engineer of the Orion Clipper, another new supertanker. It was understood that he would stand the 12 to 4 watches in the engine room, but would take it easy and favor his foot.

The Orion Clipper left Sparrows Point for the Ras Tanura-Sasebo run. Libellant had to climb 80 feet up and down ladders twice a day. This, together with the normal vibration of the floor plates, and the pitching of the ship in rough weather, aggravated the condition of his foot and loosened the brace. His foot had become swollen, painful and somewhat inverted before the ship ran into a typhoon on November 30, 1954, while she

438

was passing the Straits of Malacca and entering the South China Sea. The rough weather continued and on the third day they passed within 100 miles of the center of the typhoon. On December 3, with the ship pitching and rolling 30 to 35 degrees, libellant fell, twisting his foot and injuring his knee slightly. The injury to the ankle was more severe than the original injury had been. He was helped up the ladder to his quarters and was relieved of duty by the chief engineer after he had written the chief that due to the injury on the Orion Star, he was no longer capable of standing on his feet, his knees were getting weak, the injured foot caused severe pain up the leg and into the hip, his nerves were "at wit's end", everything seemed to irritate him, his breath was getting short, he had a dull ache around his chest and was no longer willing to be responsible for the safety and operation of the plant in case of an emergency.

I find as a fact that, although the weather was such that anybody might have fallen, the fall on December 3 and resulting re-injury to the ankle were substantially contributed to by the condition of his ankle as a result of the first injury and its failure to mend as quickly as the doctors had hoped when they allowed him to return to work.

He was put ashore at Sasebo, examined and treated, sent by train to Yokohama and flown to the United States. The conflicting translations of the Japanese medical reports and the Japanese depositions are not helpful. The conclusions of the Japanese doctor were evidently based upon a confused history.

Upon libellant's return to Baltimore, he did not go to the Marine Hospital, but went back to Dr. Glass, who, finding Dr. Voshell unavailable because of illness, referred libellant to Dr. Ullrich, who was taking care of Dr. Voshell's practice. Dr. Ullrich thought a fusion operation was desirable; but following a visit by libellant to respondent's office in New York and a telephone conversation with Dr. Ullrich, the company wrote Dr. Ullrich refusing to authorize him to oper-

ate. Since Dr. Ullrich was having difficulty getting a hospital bed, Dr. Glass referred libellant to Dr. E. David Weinberg, an orthopedic surgeon, who also considered a fusion operation necessary and arranged to have libellant admitted to the South Baltimore General Hospital. Dr. Weinberg fused the joint between the astragalus and the oscalcis and also the joint between the cuboid and the oscalcis. This operation has greatly reduced the inversion of the foot and ankle, and has made the important back part of the foot stronger, although libellant still has a tendency to throw the front part of the foot in, which is less important. There is some limitation of the ankle joint proper. After an appropriate time for healing, Dr. Weinberg recommended physiotherapy, which has been given by Mr. Kendall, a very capable physiotherapist. Libellant was examined by Dr. Voshell on behalf of respondent in January and February, 1956.

Libellant is now receiving physiotherapy three times a week. This should continue until warm weather sets in. Thereafter he will require occasional physiotherapy for a period not exceeding one year from February, 1956. Libellant has a low threshold of pain, and is temperamentally unable at this time to make the necessary efforts to secure the maximum use of his foot, but he is not a conscious malingerer.

I find, in line with the testimony of Dr. Weinberg and Dr. Voshell, that libellant now has an anatomical loss of use of his foot of about 60% to 65%, which might be reduced to somewhere around 25% if libellant were psychologically capable of helping himself at this time. He is now disabled from doing any work which requires prolonged standing or climbing and will almost surely not be able to go to sea again.

Libellant is a chronic complainer; he made many charges of mistreatment, which were contradicted by other evidence, and which I find to be untrue. There is no basis for libellant's contention that any of the medical treatment he received was improper. Although the

doctors in Ras Tanura may not have been as competent as the doctors in Singapore and Baltimore, they gave the normal treatment for a sprained ankle. The diversion of the S.S. Steel King, which prevented libellant from going to a hospital between March 13 and May 13, meant that the cast had to be kept on during that entire time; but Dr. Cameron of Singapore had recommended that the cast be kept on for two months. The prolonged immobilization of the knee has resulted in some permanent limitation of motion, but the immobilization was due to the fact that Dr. Cameron considered the ligaments to have been so badly torn that it was necessary to keep the cast on for two months. The treatment at the Marine Hospital in May, 1954, was proper. Nor can the doctors be criticized for allowing libellant to return to work in August, 1954, although his ankle had not completely healed. Active use of the foot was indicated, and libellant, respondent and the doctors were agreed in thinking that it was wise for him to try to return to work. It was a calculated risk. The results were unfortunate; but it cannot properly be said that anybody was to blame for recommending the experiment.

Libellant earned $806.87 per month, plus $100 overtime, a total of $906.87 per month as first assistant engineer on the Orion Star. A third assistant engineer receives $537.85 per month but makes much more overtime. Libellant was earning about $735 per month as third assistant engineer. A marine engineer does not ordinarily work twelve months a year. During 1953 libellant earned $6,922.20 from respondent and $380.08 from others, a total of $7,300.38. His income tax return for that year shows a somewhat higher income ($8,351.83) because it was based upon cash paid rather than cash earned. That was the only income tax return libellant produced, and it may be inferred from that and other facts that libellant's income during the previous years was considerably less. Earnings of engineers on supertankers are higher than earnings for similar positions on respondent's other ships. On the whole, it seems reasonable to conclude that libellant might have expected to earn between $7,000 and $7,500 per year as a marine engineer.

As a stationary engineer on shore, he never earned more than $3,300 per year, plus his salary as chairman of the State Board of Examining Engineers. Some stationary engineers employed in industry earn a great deal more than that, but the type of position which libellant will now be able to take ashore is limited by his inability to climb. It seems probable that his present wage-earning capacity ashore is between $3,500 and $4,000.

Libellant is now 52, and has a life expectancy of 20.47 years. That would carry him to age 72. However, the large shipping companies are requiring their engineers to retire at 65, although some marine engineers work beyond that age. A company-financed pension plan is available, depending upon the length of time a man has served. Libellant, having worked ashore from 1936 to 1950, has not accumulated many service credits.

The present value of $1,000 per year for 13 years, received in equal monthly installments, assuming various annual interest rates, is as follows: 2½%—$11,108.52; 3%—$10,780.41; 3½%—$10,466.99; 4%—$10,167.42.

The similar figures for 20½ years are: 2½%—$16,049.91; 3%—$15,337.38; 3½%—$14,670.21; 4%—$14,047.70; 6%—$11,923.94.

I find that under present circumstances 3½% is a reasonable rate to assume.

Libellant has had considerable pain and suffering and will have some in the future. He has been prevented from dancing and bowling, which he has always enjoyed.

The unpaid medical bills of Dr. Glass $525, Dr. Weinberg $500, South Baltimore General Hospital $219.20, and Mr. Kendall $315, are reasonable in amount.

The following facts are stipulated:

Libellant has received $2,948.53 gross wages to the end of the voyage of the Orion Star (March 13, 1954–July 2, 1954). He has no further wages due him for his service aboard the Orion Star.

Libellant has received $784 for maintenance and cure to and including August 4, 1954, following his leaving the Orion Star. He has no further sums due him in maintenance following his leaving the Orion Star.

Libellant has received $1,721.12 gross wages to the end of the voyage of the Orion Clipper (December 9, 1954–March 14, 1955). He has no further sums due him for his services aboard the Orion Clipper.

Libellant has received $3,376, being all the maintenance and cure due him following his service aboard the Orion Clipper to and including February 20, 1956, the date of the trial.

### Conclusions in re Damages.

The damages properly allowable include unpaid wages to date and until libellant will probably be able to take a job; probable loss of earnings in the future after he does return to work, due to his reduced earning capacity as a result of the two accidents, having in mind that the disability should decrease considerably if libellant's motivation to help himself is sufficiently strong; pain and suffering, past and future; and inability to engage in his normal activities.

The question whether respondent is liable for the bills of Dr. Glass, Dr. Weinberg, the South Baltimore General Hospital, and Mr. Kendall is sharply disputed. The law is clear that a seaman is required to accept reasonable treatment at the Marine Hospital and that he cannot leave the Marine Hospital against medical advice and hold the ship for future doctor bills. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993; Stokes v. United States, 2 Cir., 144 F.2d 82; The Bouker No. 2, 2 Cir., 241 F. 831, certiorari denied 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529; United States v. Loyola, 9 Cir., 161 F.2d 126; Hoff v. United States, D.C. Wash., 87 F.Supp. 909; Benton v. United Towing Co., D.C.N.D.Cal., 120 F. Supp. 638; Vitco v. Joncich, D.C.S.D. Cal., 130 F.Supp. 945; Norris, The Law of Seamen, Vol. 2, Sec. 593. Libellant left the Marine Hospital against the advice of the doctors there. There was no reason for him to go to Dr. Glass nor to the doctors to whom Dr. Glass referred him, for treatment or physiotherapy. Respondent paid the bill of Dr. Voshell for consultations in July and August, 1954, because it engaged him to make the examinations. Respondent is not liable for any other medical bills.

The parties are agreed that the decree should include an award for future maintenance and cure. Since any necessary physiotherapy can be obtained at the Marine Hospital, and none of the doctors thought that any further medical attention would be necessary, a proper award for future maintenance and cure (after February 20, 1956) under the third cause of action is $1,500.

A proper award for damages under the first cause of action, based on unseaworthiness, is $40,000.

Libellant is entitled to no damages under the second cause of action for the alleged failure to provide proper medical attention.

All claims against the impleaded respondents should be dismissed.

Counsel will prepare an appropriate decree.