J. Irwin Shapiro, J.
During the trial the jury was discharged and the case continued as a nonjury cause with a stipulation that the court in the first instance determine the issue of liability, and that if this were resolved in plaintiff’s favor the damages were to be assessed by the court thereafter.
Defendant railroad contracted with Seaboard Terminal & Eefrigeration Co. (Seaboard) for stevedore and marine handling operations on barges owned by it. Plaintiff, a longshoreman, in the employ of Seaboard, was injured when a gangplank or platform, which was being placed so as to bridge two barges, fell upon him. In his complaint he charges that this occurred “ by reason of unseaworthiness of the vessel and by reason of defendant’s failure to provide gear and equipment reasonably safe and adequate for the intended purpose of shifting gangplanks and similar appurtenances. ’ ’ The complaint also charges negligence on the theory that defendant failed to furnish plaintiff with a safe place to work.
There was not a scintilla of proof to support any recovery on the theory of negligence and this claim has apparently been abandoned for no reference to it is contained in plaintiff’s brief. *516 In any event, neither the gang-plank nor the gear or equipment employed to move it were defective nor was there any affirmative act of negligence by any servant of defendant which caused the occurrence.
The sole issue therefore is whether defendant is liable under applicable maritime decisional law for failure to provide equipment reasonably adequate for the purpose of shifting the gangplank and placing it as a bridge across the two barges.
The court finds the following facts to be established by the evidence and stipulations of the parties:
On October 27, 1954 at about 8:00 a.m. plaintiff, who had worked for Seaboard for about two years, reported for the morning shape-up at Pier 48 North Eiver and was hired about 8:20 a.m. At the pier the bulkhead contained three berths for mooring barges or floats upon which railroad cars were standing. Behind the barge moored in the center berth another barge was tied. Both had apparently been towed across from New Jersey to be unloaded in New York. Plaintiff was assigned to work on the barges in the center berth. When he arrived there he saw eight or nine men attempting to move a gangplank onto the first barge which was moored to the bulkhead. This gangplank was to be used to bridge the area between this barge and the one tied to the rear of it. The crew of men were endeavoring to move it to the barge over an existing gangplank which extended from the first barge to the dock. The tide and wind at the time were very high causing the barges to be high above the level of the dock. As a result the gangplank over which the second plank was to be moved was at a very sharp upward angle. Some men had grabbed the ropes attached at each of the four corners and kept pulling at them while others kept pushing the plank but it kept sliding down. This had occurred while plaintiff was being “ shaped up ” and he was sent with additional men to assist in the operation. After several further unsuccessful attempts, plaintiff suggested that a tractor be used and one was procured. The plank was tied to the tractor and with the men assisting in pushing and pulling it, the plank was finally gotten onto the float. There it was placed on a hand truck and rolled several feet along the platform of the float. Plaintiff then went to the other end of the float. There were other men “ tieing in ” the second float and he assisted them. Thereupon a hi-lo driver (a hi-lo is “a vehicle which has a contraption in the front of it to lift things up ” and move them) brought the gangplank which had been put aboard the barge down to the rear of the barge and plaintiff and one or two other men attempted to lift and guide the gangplank with the assist *517 anee of the hi-lo onto the platform of the second float. The hi-lo carried the gangplank between its fork and shoes pushing it along the platform. It could barely raise it off the platform. The end of the platform of the barge on which the hi-lo was working sloped from four feet to three feet in a six-foot distance so that the hi-lo could not go past the top of the slope and approach close to the edge without toppling over. The attempts to bridge the barges with the gangplank by the use of the hi-lo and the three men were unsuccessful so four additional men were sent for. Three of the men then got on one side of the open end of the gangplank and four on the other and again along with the aid of the hi-lo they attempted to lift and guide the gangplank. The hi-lo would advance and push the gangplank and then attempt to lift it. However, the machine and men working together could not lift the gangplank to a height sufficient to get it over the edge far enough to bridge the gap between the two barges so after each attempt they would lay it down again. Each time the hi-lo would pitch forward and the back wheels would rise. Then the hi-lo would back up to get more leverage and make another attempt. Finally the gangplank was laid across so that it barely lay on the edge of the platform on the opposite barge. It lay there for a few seconds and then slipped off. This occurred because it was only two inches over the edge of the barge platform and it fell before the men could secure the four ropes attached to it to the barges which would have been done if it had been placed in its proper position. At the time the wind was very high — about 25 miles an hour; the barges were bobbing up and down in the water and swinging from side to side. In falling, the gangplank struck plaintiff’s leg, knocking him down and pinning him under it. The procedure before the accident was for the hi-lo to push the gangplank, lift it, then to back up and push again.
The court is satisfied from the proof that it was the usual practice of plaintiff’s employer — Seaboard — to use a hi-lo in placing gangplanks across barges and that Erie had knowledge of that practice. Plaintiff had previously worked on a gangplank of the same size and the same practice was followed but most of the time the gangplank did not have steel plates. The gangplank used on the day of the accident was about 6 feet wide and 12 feet 6 inches in length and although there was no proof as to its weight it is undisputed that the lii-lo could barely get it off the platform.
It was stipulated by the parties that all of the hi-los on the pier were of the same weight-carrying capacity as the one used in this case and that they were not of sufficient capacity ‘ ‘ without *518 men assisting on the side of the gangplank ” to lift and move the gangplank.
Under its contract with Seaboard, defendant was required to furnish1 ‘ such freight handling equipment, such as trucks, gangplanks, tractors, trailers and other equipment, as may be necessary for the proper, expeditious and efficient handling of freight.” Defendant further agreed in its contract with Seaboard that it would “ upon demand * * * furnish * * * such additional freight handling equipment and appliances as may be necessary. ’ ’
Though defendant supplied the hi-lo it was Seaboard that devised the shoes on the fork lift of the hi-lo and the method of lifting and carrying the gangplanks at one end. Defendant had knowledge that for several years Seaboard had engaged in that practice.
Concededly, the method thus used by Seaboard, to bridge the two barges, was not the only method which could be used.
A photograph in evidence demonstrates that a gangplank can be lifted and held at one end by the fork and shoe of a hi-lo at a height of about seven feet above and parallel to the ground. However, the gangplank used at the time of the accident was considerably heavier than the one portrayed in the photograph and it therefore caused the hi-lo with its two-ton limited weightlifting capacity, to tilt forward with its rear wheels off the ground and in the air.
Thus, the failure of defendant to supply a hi-lo of greater weight-lifting capacity than two tons was at least a concurring proximate cause of the accident, and I so find as a fact.
It is plaintiff’s contention that by such failure defendant violated the nondelegable and absolute duty owed by it to plaintiff under maritime law of supplying appurtenances reasonably adequate for their intended use and that that failure rendered the defendant’s barges unseaioorthy as a matter of law. Defendant in its brief says: “ It is defendant’s position that there can be no liability whatever on its part to the plaintiff for the reason that all equipment, the car floats, the manner of doing the work, the supervision of the work, the direction of the work and all details of it, had, by the contract, been left to Seaboard. ’ ’
Since the accident occurred while the defendant’s vessels were in navigable waters, the substantive Federal maritime law is exclusively applicable to the issue of liability. (Riley v. Agwilines, Inc., 296 N. Y. 402; Pope & Talbot v. Hawn, 346 U. S. 406.) An analysis of the substantive law on the subject as evolved by decisions in the Federal courts demonstrates the *519 plaintiff’s right to recover and the invalidity of defendant’s contention.
The doctrine of seaworthiness is based on an admiralty doctrine of breach of warranty and not of negligence. It imposes on the shipowner an absolute duty to maintain a vessel in a seaworthy condition and to supply appurtenances adequate and sufficient for the occasion. (Socony-Vacuum Co. v. Smith, 305 U. S. 424.) Therefore, the common-law defenses of assumption of risk, fellow-servant rule, or contributory negligence are insufficient to defeat the action (The Arizona v. Anelich, 298 U. S. 110; Klimaszewski v. Pacific-Atlantic S. S. Co., 246 F. 2d 875 [C. C. A. 3d]), though the doctrine of comparative negligence applies and plaintiff’s contributory negligence may thereby diminish the amount of his recovery. (Seas Shipping Co. v. Sieracki, 328 U. S. 85; Pope & Talbot v. Hawn, 346 U. S. 406, supra.)
Since the liability of a shipowner is not bottomed on negligence, his lack of knowledge or notice of the condition causing the accident is not a defense (The H. A. Scandrett, 87 F. 2d 708 [C. C. A. 2d]). In that case plaintiff was injured while pulling on a knob of a door which was stuck. The knob came off, causing plaintiff to fall and injure his hip, resulting in a sarcoma. In upholding his right to recover, the court said (p. 711): “ In our opinion the libelant had a right of indemnity for injuries arising from an unseaworthy ship even though there was no means of anticipating trouble. ’ ’
The landmark case in the development of the doctrine of unseaworthiness is The Osceola (189 U. S. 158, 175) where the court stated:
“ Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following proposition:
# # #
“ 2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship.”
In its opinion the court cited The Edith Godden (23 F. 43) as illustrative of the principle of unseaworthiness. There, libelant was injured when a hook that held a derrick in place broke while a longboat was being lifted in rough seas. An examination of the hook showed no defects in the iron at the place of the break and there was no apparent insufficiency in *520 the hook. The court found that the cause of the accident was in lowering too heavy a weight in the rolling’ seas and that this, in turn, was caused by the inadequacy of the hook for the purpose for which it was used and that thereby the vessel was made unseaworthy.
Seaworthiness was defined in Mesle v. Kea S. S. Corp. (260 F. 2d 747, 750-751 [C. C. A. 3d]) as follows:
“ ‘ Seaworthiness ’ is another of those terms in the law which by reason of its appearance in different contexts has developed an elusiveness making impossible an omnisufficient definition. But in order to articulate our standard of judgment we must presume to attempt a definition of the term sufficient at least for the purposes of this case.
“ It is quite apparent that whether or not an appurtenance is ‘ in fit condition * * * for a voyage and the incident perils of the sea ’ is usually an irrelevancy. It is said that ‘ (t)he concept of seaworthiness contemplates no more than that a ship’s gear shall be reasonably fit for its intended purpose.’ Yet examination of a great many personal injury cases in which claims of unseaworthiness were presented leads to the conclusion that those cases are of two categories, both of which fit this general definition. One is where the shipowner, having knowledge — actual or constructive — that certain activity will occur, is imposed with an absolute duty of supplying equipment for permitting the conduct and accomplishment in reasonable safety of that activity; liability is imposed for failure to comply with this duty, termed one of making the vessel seaworthy. The other category is where the equipment actually supplied by the owner for doing the ship’s work proves incapable of performing its function in the manner for which it was designed.”
The categories referred to are documented by a host of authorities.
The obligation of seaworthiness was originally owed only to seamen but it has been extended to stevedores and longshoremen (Seas Shipping Co. v. Sieracki, 328 U. S. 85, supra) as well as to shore-side workers who now furnish services to a ship which theretofore were usually performed by the crew. (Pope & Talbot v. Hawn, 346 U. S. 406, supra.)
For an' appurtenance to be seaworthy it must be reasonably adequate for the purpose intended. (Mahnich v. Southern S. S. Co., 321 U. S. 96, 100.) The almost all-inclusive sweep of this doctrine of seaworthiness with respect to adequacy of appurtenances may be gathered from such cases as Green v. Orion Shipping & Trading Co. (139 F. Supp. 431). There plaintiff *521 was injured when the shaft of a wrench broke while he was tightening some nuts, as the result of which he fell and sustained injuries. The court, in its opinion in that case, stated (p. 435): “ The defective wrench rendered the ship unseaworthy, irrespective of respondent’s knowledge or negligence, since it was not a reasonably safe tool or appliance. Mahnich v. Southern S. S. Co., 321 U. S. 96, 64 S. Ct. 455, 88 L. Ed. 561; Seas Shipping Co. v. Sieracki, 328 U. S. 85, 66 S. Ct. 872, 90 L. Ed. 1099; Petterson v. Alaska S. S. Co., 9 Cir. 205 F. 2d 478, affirmed 347 U. S. 396, 74 S. Ct. 601, 98 L. Ed. 798; Poignant v. United States, 2 Cir., 225 F. 2d 595.”
In Vega v. The Malula (291 F. 2d 415, 419-420 [C. C. A. 5th]) the court wrote: “ The event occurred. The block failed. The block failed while being used for a normal expected purpose. That is, and has been, at least since Sieracki in 1947, a classic case of patent unseaworthiness. The passage of time has but made the warranty of seaworthiness more awesome as it extends to gear used without regard to ownership and to transitory conditions. Alaska Steamship Co. v. Petterson, 1954, 347 U. S. 396, 74 S. Ct. 601, 98 L. Ed. 798,1954 A. M. C. 860; Crumady v. The Joachim Hendrik Fisser, 1959, 358 U. S. 423, 79 S. Ct. 445, 3 L. Ed. 2d 413, 1959 A. M. C. 580; Mitchell v. Trawler Racer, Inc., 1960, 362 U. S. 539, 80 S. Ct. 926, 4 L. Ed. 2d 941, 1960 A. M. C. 1503; Pope & Talbot v. Hawn, 1953, 346 U. S. 406, 74 S. Ct. 202, 98 L. Ed. 143,1954 A. M. C. 1; Rogers v. United States Lines, 1954, 347 U. S. 984, 74 S. Ct. 849, 98 L. Ed. 1120, 1954 A. M. C. 1088; Gilmore & Black, Law of Admiralty, § 6-41 at 322-332, § 6-53 at 358-374; Baer, At Sea with the United States Supreme Court, 38 N. C. L. Rev. 307 (1960). How the pin happened to slip out is of no real legal significance. No matter how much care was used either by the owner, the ship’s crew, or the deceased crew member immediately responsible for its maintenance, the failure of the block under normal expected use visits on the vessel owner an unremitting liability based on the breach of the absolute duty. Michalic v. Cleveland Tankers, Inc., 1960, 364 U. S. 325, at page 327, 81 S. Ct. 6, at page 9, 5 L. Ed. 2d 20,1960 A. M. C. 2251 ; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F. 2d 629, at page 637,1957 A. M. C. 1927; Vickers v. Turney, 5 Cir., 1961, 290 F. 2d 426.”
In Michalic v. Cleveland Tankers (364 U. S. 325) plaintiff claimed to have suffered injuries when a wrench he was working with slipped and fell on his toe, aggravating a pre-existing condition of Buerger’s disease. It was his contention that the grip on the wrench was worn and that this caused the wrench *522 to slip. In reversing the court below and remanding the case for a new trial on the issue of unseaworthiness the court stated (pp. 327-328):
“ The basic dispute between the parties is as to the sufficiency of the proofs to justify the jury’s finding with reason that respondent furnished Michalie with a wrench which was not reasonably fit for its intended use. Here a distinction should be noticed between the unseaworthiness and Jones Act claims in this regard. The vessel’s duty to furnish seamen with tools reasonably fit for their intended use is absolute, Mahnich v. Southern S. S. Co., 321 U. S. 96; Seas Shipping Co. v. Sieracki, 328 U. S. 85; The Osceola, 189 U. S. 158; Cox v. Esso Shipping Co., 247 F. 2d 629; and this duty is completely independent of the owner’s duty under the Jones Act to exercise reasonable care. Mitchell v. Trawler Racer, Inc., 362 U. S. 539. The differences are stated in Cox v. Esso Shipping Co., supra:
“ ‘ One is an absolute duty, the other is due care. Where * * * the ultimate issue * * * [is] seaworthiness of the gear * * # The owner has an absolute duty to furnish reasonably suitable appliances. If he does not, then no amount of due care or prudence excuses him, whether he knew, or could have known, of its deficiency at the outset or after use. In contrast, under the negligence concept, there is only a duty to use due care, i.e., reasonable prudence, to select and keep in order reasonably suitable appliances. Defects which would not have been known to a reasonably prudent person at the outset, or arose after use and which a reasonably prudent person ought not to have discovered would impose no liability. ’ 247 F. 2d, at 637.”
Even if the unseaworthy condition has been created by the injured employee, a recovery of damages by him is not barred (Pinion v. Mississippi Shipping Co., 156 F. Supp. 652). In that case, plaintiff was sent by his employer to make certain repairs on board the defendant’s ship. To do so, he personally created a scaffold by placing an 8-inch plank on a 3-foot ladder, resting the other end on a baggage rack. While reaching overhead to work on a pipe, he lost his balance on the narrow 8-inch plank and fell to the deck, sustaining injuries. In awarding damages to plaintiff under the unseaworthiness doctrine, the court stated (p. 657): -
“ Respondent’s suggestion that the eight-inch plank which formed part of the scaffolding may have been brought aboard the vessel by Ferran cannot save the ship owner from liability for failure to furnish a seaworthy vessel. Whoever furnished the scaffolding, it was still the nondelegable duty of the ship *523 owner to furnish Pinion adequate equipment and a safe place to work. Alaska Steamship Co., Inc., v. Petterson, 347 U. S. 396, 74 S. Ct. 601, 98 L. Ed. 798. The fact that Pinion was injured as a result of the unseaworthy equipment makes the ship owner liable for his damages, irrespective of fault.
# * *
“ Respondent also suggests that if the scaffolding was inadequate, Pinion was in the best position to make that appraisal. But a person entitled to the warranty of seaworthiness does not assume the risk of unseaworthy equipment. In Mahnich v. Southern Steamship Co., supra [321 U. S. 96, 64 S. Ct. 459] where claim of unseaworthiness was also based on an unseaworthy scaffold, the Court said:
“ 1 Whether petitioner knew of the defective condition of the rope does not appear, but in any case the seaman, in the performance of his duties, is not deemed to assume the risk of unseaworthy appliances.’
“ And in Palermo v. Luckenbach Steamship Co., 78 S. Ct. 1, the Supreme Court reversed a judgment of the Second Circuit, 246 F. 2d 557, which denied recovery to a longshoreman who was injured when he, knowing a safe alternate passageway was available, elected to return to his work via a ship passageway he had reason to believe was unsafe. ’ ’
In Casbonr v. Stockard S. S. Corp. (173 F. Supp. 845) plaintiff, a carpenter, fell when a scaffold built by himself of two 1 inch by 10 inches boards, placed one on top of the other, broke in the middle, while he toas standing on it. It broke because the boards were of second-grade knotty lumber taken from a pile which he was to nail in the vessel and which the court found were not suitable or adequate for the purpose of standing upon. The court, in finding for the plaintiff on the doctrine of unseaworthiness, said (p. 849): “ This equipment, or lack of equipment, furnished by the stevedore, under the law is the responsibility of the shipowner.”
In Grillea v. United States (232 F. 2d 919 [C. C. A. 2d]) plaintiff, together with another longshoreman, placed a wrong hatchcover over the “ pad eye ” of a ship on one day, and on the following day, when stepping on it, the hatchcover gave way under him. In finding for plaintiff on the ground of unseaworthiness, the court stated (p. 923): “ It may appear strange that a longshoreman, who has the status of a seaman, should be allowed to recover because of unfitness of the ship arising from his own conduct in whole or in part. However, there is in this nothing inconsistent with the nature of the liability because it is imposed regardless of fault; to the prescribed extent the *524 owner is an insurer, though he may have no means of learning of, or correcting, the defect.” (Emphasis supplied.) The vast scope of the liability of a shipowner for failure to supply adequate or proper appurtenances is highlighted by the case of Poignant v. United States (225 F. 2d 595 [C. C. A. 2d]). In that case, the plaintiff, a stewardess, slipped on an apple peel in a passageway near the dining room. In reversing a judgment for the defendant on the issue of seaworthiness, the case was remanded to the District Court for a determination of the issue as to whether the absence of a garbage chute was the proximate cause of the accident and as to whether comparable vessels are generally equipped with such chutes.
Another case showing the broad sweep of liability applied in such cases is Mitchell v. Trawler Racer (362 U. S. 539). The Supreme Court there held that a transitory but dangerous condition on a vessel created by the falling of spawn upon the rail of the ship during fishing operations made the ship unseaworthy, even in the absence of proof of notice of the condition, with resulting liability for damages to the injured plaintiff.
Even if we accept defendant’s contention that it had surrendered complete control of the unloading operations to plaintiff’s employer, and that it agreed only “ upon demand * * * (to) furnish * * * such additional freight handling equipment and appliances as may be necessary ” these circumstances did not relieve it of the duty to supply adequate appurtenances. Its duty was absolute and nondelegable. (Alaska S. S. Co. v. Petterson, 347 U. S. 396; Crumady v. The J. H. Fisser, 358 U. S. 423.)
In view of the conclusion to which I have come as to the lack of effect upon plaintiff’s rights as a longshoreman of the contract between the defendant and its stevedore-contractor Seaboard, it is unnecessary to further lengthen this opinion by a detailed analysis of the terms of that contract. It should be noted, however, that defendant’s oft-repeated contention that Seaboard and not it had the sole right to determine the kind of machinery, appliances and devices to be used in the handling of its freight, etc. is not borne out by the contract which in paragraph 6 thereof provides: “ If at any time or times it is believed by the proper officers of the Bailroad Company that the cost of handling freight hereunder can be reduced, by means of the installation of machinery, or of any appliance or device, or by changes in the method of handling, or otherwise, then the parties agree that the Bailroad Company may install any such machinery, appliance or device, and/or the Contractor will adopt and put into effect any such change, and the parties will compute the cost of han *525 dling of the freight for three months under such installation and/or change ”.
In addition to that portion of paragraph 6 above quoted, paragraph 4 of the contract reads: ‘ ‘ The Railroad Company agrees to furnish to the contractor such freight handling equipment * * * as may be necessary for the proper, expeditious and efficient handling of freight ”.
Defendant admits that ‘ ‘ Where power is reserved by one who has hired an independent contractor to direct or control the contractor, an affirmative duty arises to exercise that power with reasonable care.” (Defendant’s brief, p. 12, quoting Gallagher v. United States Lines Co., 206 F. 2d 177, 179, cert, denied 346 U. S. 897.)
In the Grumady case (supra), the plaintiff was injured when a boom or its appurtenances fell upon him. This occurred when the two-part topping lift of the boom broke and the head of the up-and-down boom, with its attached cargo and topping lift, fell. This was caused by the fact that the winch at the time was carrying a load which was more than double the safe working load of the boom. All of the equipment was in good condition. The winch which serviced the boom had a “ cut-off ” device or circuit-breaker, the purpose of which was to cut off the current at the point of stress for which it was set. It had been set to operate at a load of more than twice the safe working load by the ship’s employees before the ship was turned over to the stevedores. The trial court made a determination of unseaworthiness. It also found that the stevedores moved the head of the boom in an effort to clear the cargo from the sides of the hatch and that they “ created a load on the topping lift greatly in excess of its safe working load ”. The Court of Appeals reversed, holding that the vessel was not unseaworthy and that the sole cause of the injury was the negligence of the stevedores (249 F. 2d 818). In reversing the Circuit Court, the Supreme Court said (358 U. S. 423, 426-427) :
“ We held in Seas Shipping Co. v. Sieracki, 328 U. S. 85, 95, that stevedores, though intermediately employed, are, when performing ‘ the ship’s service,’ entitled to the same protection against unseaworthiness which members of the crew doing the same work would receive. And see Pope & Talbot v. Hawn, 346 U. S. 406. The work of loading and unloading is historically ‘ the work of the ship’s service.’ Seas Shipping Co. v. Sieracki, supra, at 96.
“ This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. Seas Shipping Co. v. Sieracki, supra, at 100. Unseaworthiness extends not *526 only to the vessel but to the crew (Boudoin v. Lykes Bros. Steamship Co., 348 U. S. 336) and to appliances that are appurtenant to the ship. Mahnich v. Southern S. S. Co. 321 N. S. 96. And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. Id., at 104; The Osceola, 189 U. S. 158, 175. The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company. It was held in Grillea v. United States 232 F. 2d 919, that stevedores themselves could render a ship pro tanto unseaiuorthy and malte the vessel owner liable for injuries to one of them. And see Rogers v. United States Lines, 347 U. S. 984; Alaska S. S. Co. v. Petterson, 347 U. S. 396. We need not go so far to sustain the District Court here.” (Emphasis supplied.)
In Holley v. The Manfred Stansfield the first trial resulted in a judgment for defendant. It was reversed by the Circuit Court with a remand to the trial court (269 F. 2d 317, 4th Cir.). Certiorari was denied by the United States Supreme Court (361 U. S. 883). The remand was for the purpose of the court making findings with respect to seaworthiness. On retrial the parties consented to have the determination resolved by the record of the first trial. The District Court found that the vessel did become unseaworthy when decedent, a longshoreman, by his own actions, in the use of a “ pay-loader ”, and contrary to instructions by his superior, created an overhang in solidified potash. Minutes later, in an effort to loosen the cargo by striking the solid mass with the “ pay-loader ”, a block of potash approximately 4 square feet fell upon him and caused his death. The court held that the creation of the overhang, even though slight, brought about a condition of unseaworthiness and rendered the vessel reasonably unfit for its normal function. (Holley v. The Manfred Stansfield, 186 F. Supp. 212.)
In United States Lines Co. v. Lavino & Co. (198 F. Supp. 483 [1961]) plaintiff, a longshoreman, was injured as a result of the use by the stevedoring company employed by defendant to discharge the cargo, of a wire which was inadequate and improper for the use to which it was put; this was deemed to make the vessel unseaworthy.
In De Van v. Pennsylvania R. R. Co. (167 F. Supp. 336) the court determined that a hook though not in any way defective, was inadequate for the unloading of certain pipe which fell upon the plaintiff and that thereby the ship was rendered unseaworthy.
*527 A statement thoroughly apposite to the problem in this case is contained in Cooper v. D/S A/S Progress (168 F. Supp. 578, 585) where the court wrote: “ Also, the doctrine of unseaworthiness required the shipowner to supply equipment and devices sufficient to permit the unloading job to be done in reasonable safety, even though this might have required equipment in addition to the payloader, such as other devices or more personnel, to remove the rock-like lumps of sugar. See Mesle v. Kea Steamship Corporation, supra, 260 F. 2d at page 751; cf. Grillea v. United States, 2 Cir. 1956, 232 F. 2d 919, 922; Mitchell v. Trawler Racer, Inc. 1960, 362 U. S. 539, 548-550, 80 S. Ct. 926, 4 L. Ed. 2d 941.”
Here, too, it was defendant’s duty, even though not requested by Seaboard, to supply equipment, implements and devices sufficient to permit its job to be done in reasonable safety by Seaboard’s longshoremen. It could not by the terms of its contract with Seaboard shift its maritime liability as between it and the longshoremen employed on its barges, to Seaboard.
The cases cited by defendant either do not bear out its contention or are not in point.
Thus, in Gallagher v. United States Lines Co. (206 F. 2d 177, cert, denied 346 U. S. 897, rehearing denied 346 U. S. 940) the determination of the effect of the contract between the parties on the rights of the plaintiff was determined “ under the law of New York (which governs, since the accident occurred within that State) ”. Here, the law of New York State has no bearing-on plaintiff’s right as a longshoreman; they are determinable by Federal maritime law. (Pope & Talbot v. Hawn, 346 U. S. 406, 409, supra; Riley v. Agwilines, Inc., 296 N. Y. 402.)
Salmond v. Isbrandtsen Co. (286 App. Div. 1015, motion for leave to appeal denied 309 N. Y. 1033, cert, denied 351 U. S. 986) is inapplicable for two reasons. The first is that the basic ground of the opinion was that: “ this case is not governed by maritime law because plaintiff’s injuries were not ‘ caused by a vessel’ ” and for the further reason that “ even assuming that the ease is governed by maritime law, there is no proof of unseaworthiness ” because “There is no proof * * * that the equipment used was not reasonably fit for the use for which it was intended ”.
The facts here, of course, are that this action comes under the maritime law and not the law of New York State and that here there is a concession that the hi-lo “ was not reasonably fit for the use ” to which it was put when it was supplied to Seaboard *528 by defendant and of the manner of which use defendant had notice and knowledge for a long period of time.
In Filipek v. Moore-McCormack Lines (258 F. 2d 734) plaintiff was not one of a class of persons protected by maritime law against unseaworthiness.
Dougall v. Spokane, P. & S. Ry. Co. (207 F. 2d 843) and Wallach v. United States (184 F. Supp. 785, affd. 291 F. 2d 69) are not maritime cases and in addition the Wallach case was decided upon the applicability of “ the most recent New York authorities as well as federal cases interpreting New York law ” (p. 789) which cases “ are in accord that unless the general contractor assumes responsibility directly for supervising the method of work or giving express directions or assurances of safety, he has no responsibility for the manner in which operations are carried out by the subcontractor’s employees.” That is good law when one deals with building operations in New York State, but it has nothing to do with the situation here which must be determined under maritime tort law.
Berti v. Compagnie De Navigation Cyprien Fabre (213 F. 2d 397) contains dictum in the opinion which supports defendant’s position, but the judgment was reversed because the trial court in his charge told the jury that defendant ‘ ‘ could be found liable, despite fully adequate equipment, solely on the basis of its failure properly to supervise the operation.” “ This ” said the court, “ we think was fatal error ” (p. 399).
Thus, the rationale of that case was the attempt of the court in its charge to make the defendant liable ‘ ‘ despite fully adequate equipment ”, i.e., even though the ship was seaworthy. Of course here, that is not the situation. In addition, the soundness of that case has been recently questioned in Holley v. The Manfred Stansfield (186 F. Supp. 212, 215) where the court said: “ The Berti case is at least of dubious vitality in light of Crumady [358 U. S. 423] and the trends established by more recent pronouncements of the United States Supreme Court.”
In Oblatore v. United States of America (181 F. Supp. 825, affd. 289 F. 2d 400, 402) both the trial and appellate court relied for their determination upon the criticized Berti case (supra) and in addition the basis of the determination was the finding as a fact that the equipment was adequate and that ‘ ‘ we cannot say that in the circumstances of this case the United States violated its duty to provide the longshoremen with a safe place to work.” Oblatore is therefore inapposite here.
Since, “ Despite much weeping and gnashing of teeth by interests adversely affected, the doctrine of liability without fault remains firmly embedded in the general maritime law ” *529 (Gasbon v. Stockard S. S. Corp., 173 F. Supp. 845, 848, supra), it is my conclusion from a most detailed study of the cases above set forth (and many others not cited) that:
(1) When a longshoreman is performing a function essential to maritime service on board a vessel in navigable waters the fortuitous circumstance that he is employed by a stevedore contractor does not determine or limit the measure of his rights against the owner of the vessel. (Seas Shipping Co. v. Sieracki, 328 U. S. 85, 97, supra.)
(2) The absence of any negligence on the part of the owner of the vessel is wholly immaterial for his duty to maintain a ship in a seaworthy condition, and this includes the adequacy of all appurtenances such as tools, machinery, implements, etc., is nondelegable. (Socony Vacuum Co. v. Smith, 305 U. S. 424, supra.)
(3) Contributory negligence is not a defense in an action against the owner of a vessel for a maritime tort but merely serves percentagewise to diminish the amount of plaintiff’s recovery. (Pope & Talbot v. Hawn, 346 U. S. 406, supra.) As a consequence a longshoreman may recover even if the unseaworthiness complained against is of his own creation and is created by the use of tools or machinery for a purpose for which they were not originally designed or intended to be used and even by conduct on his part contrary to the instructions of his superior. (Grillea v. United States, 232 F. 2d 919 [C. C. A. 2d], supra; Holley v. The Manfred Stansfield, 269 F. 2d 317, cert, denied 361 U. S. 883, supra.)
(4) The shipowner cannot slough off his maritime responsibility by turning over control of the loading or unloading of the ship to a stevedoring company. (Crumady v. The J. H. Fisser, 358 U. S. 423, supra.)
I find as a fact that in doing the work that he was, in the way that he was, and in the same way that it had been done theretofore, plaintiff was merely following the directives of Ms employer and was not guilty of any degree of contributory negligence, a situation, wMch if it existed, would not bar but diminish the amount of his recovery, and that he sustained injuries because the equipment he was using was inadequate for the purpose for which it was being used, a fact of which the defendant was fully aware.
It follows from what has been written that judgment is directed in favor of plaintiff on the question of liability. Testimony on the quantum of plaintiff’s damage will be taken at Trial Term, Part XXIII on April 16,1962 at 10:00 a.m.