## WHITIN MACHINE WORKS v. UNITED STATES.

### No. 4401.

United States Court of Appeals First Circuit.

June 16, 1949.

Before MAGRUDER, Chief Judge, and CLARK (by special assignment) and WOODBURY, Circuit Judges.

Hugh D. McLellan and Paul R. Frederick, Boston, Mass. (Charles C. Petersen, Henry V. Atherton and Badger, Pratt, Doyle & Badger, Boston, Mass., on the brief), for appellant.

Arthur M. Boal, New York City (William T. McCarthy, United States Attorney, Boston, Mass., William T. Ard, Special Attorney, Department of Justice, New York City, Charles F. Dutch and Putnam, Bell, Dutch & Santry, Boston, Mass., and Tompkins, Boal & Tompkins, New York City, on the brief), for appellee.

MAGRUDER, Chief Judge.

Whitin Machine Works (hereinafter called Whitin) is a Massachusetts corporation having its principal place of business in Whitinsville, Massachusetts. It brings this appeal from a judgment against it in favor of the United States in a civil action for breach of an alleged implied warranty under a contract for the manufacture and sale to the United States by Whitin of certain generator sets. Many grounds are urged for reversal of the judgment. We are persuaded by one, which seems to us entirely clear; hence we do not discuss the others. In the view we have taken, the case may be stated in quite simplified form.

On January 29, 1942, the United States, through the U. S. Maritime Commission, ordered a large number of generator sets from Whitin for installation on Liberty ships to supply electricity for lights and auxiliary equipment. Each set consisted of an electric generator (dynamo), which Whitin purchased from another manufac-turer, driven by a single cylinder reciprocating steam engine manufactured by Whitin. The contract provided that the generator sets were "to be complete in accordance with the specifications enclosed". In so far as now relevant, the specifications prescribed:

"The sets shall be designed to develop 20 K.W. each continuously, and 25% overload capacity for a period of at least 2 hours when operating on steam having a pressure of 220# gage and total temperature of 388 degrees F. at the throttle and against a back pressure of 12 p. s. i. gage. * * * The design shall be one that has proven satisfactory in service. Materials shall be in accordance with accepted commercial practice. * * * Governor shall be capable of controlling the revolution of the engines within 10% of the normal revolutions (400 r.p.m.) when the unit is operating at full power with a steam W.P. of 220# p.s.i. and the breaker is tripped."

Whitin assembled the generator sets and delivered them f.o.b. Whitin Station, Massachusetts, for shipment as directed. On July 6, 1942, six of these sets were shipped by Whitin to the North Carolina Shipbuilding Company, Wilmington, North Carolina, where the latter company was constructing a Liberty ship, the S. S. Henry Bacon, on government account. The shipbuilding company installed three of the generator sets in the S. S. Henry Bacon, Whitin having nothing whatever to do with such installation.

The three generator sets so installed on the S. S. Henry Bacon were connected so that any two could be used together, one being always idle. On each engine was a flywheel which served to smooth out the action of the engine. The flywheels were covered with a casing of tin for the protection of the engine room personnel. Mounted on each flywheel was a governor which controlled the speed of the engine; as the flywheel tended to increase in speed, the governor functioned automatically to cut down the steam going to the cylinder, and in this way kept the speed fairly constant. The court below made the following finding of fact with reference to the engines in question:

"These generator engines are of good design and are standard. There are thousands of them in use. They are fit and appropriate for the purpose for which they are used. The governor is also of good design and is appropriate for the engine of which it is a part. The generator engines were designed to run at a speed of 400 R.P.M. (revolutions per minute) with a load, and 410 R.P.M. with no load. When the load is suddenly lost these engines will immediately speed up to 430 or 440 R.P.M. per minute, but the governor should bring the speed down to 410, in one or two seconds."

There were circuit breakers located on the switchboard which would "kick out" and break the circuit when there was danger of damage to the generator because of an excessive load. The circuit breakers worked like a fuse; when they kicked out, the circuit was broken, no electricity was generated, and the load was taken off the engine driving the generator.

On the morning of January 18, 1943, the S. S. Henry Bacon, having loaded her first cargo at Philadelphia, was at Balboa, Canal Zone, on her maiden voyage. Suddenly the circuit breakers kicked out, the ship's lights went out, and the engine driving the starboard or outboard generator speeded up greatly. After a short interval the flywheel of this engine burst apart, and flying fragments injured Stokes, the Chief Engineer, and Marsters, his first assistant. Stokes filed a libel against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and recovered a large sum by way of damages for injuries resulting from unseaworthiness of the generator set. Stokes v. United States, 2 Cir., 1944, 144 F.2d 82. A suit filed by Marsters was settled at a compromise figure.

In the complaint now before us, the United States seeks reimbursement from Whitin for the sums it had to pay to the injured crew members and for other consequential damages attributed to the bursting of the flywheel. The theory of the complaint is that the "defendant warranted that the flywheel was properly constructed of proper materials and was suitable for the purpose for which it was to be used and the plaintiff relied thereon"; that the "defendant breached this warranty by supplying a flywheel in defective condition, which defective condition was not disclosed on inspection." It is to be noted that no claim is made of any breach of warranty as to the governor; so far as appears from the evidence, it may well be that the failure of the governor was due, not to any manufacturing defect for which Whitin was responsible, but to a subsequent operating default in the servicing of it. Further, as appears below, it is clear that the accident would not have happened if the governor had functioned properly. The government's case must stand upon the implication of a warranty that the flywheel itself would be of sufficient strength to withstand the centrifugal force attendant upon its operation at a runaway speed far in excess of the maximum of 440 r.p.m., at which it was designed to operate in its normal and expected use.

With respect to the cause of the accident, the court below adopted as its own the following findings of fact which had been made by the District Court in the above-mentioned suit brought by Stokes against the United States, 79 F.Supp. 356:

"8. The fracture of the flywheel was caused by the excessive speed of the engine. This was in turn caused by the failure of the governor to check that speed. The porosity of the cast iron in the flywheel made it more liable to burst and break apart with the increased centrifugal force of the speeding engine.

"9. The failure of the governor to check the speed of the engine was due to some defect, which cannot be determined because the generator [governor?] was completely destroyed when the flywheel burst asunder.

"10. The disintegration of the flywheel was due to the unseaworthy condition of the governor of the flywheel, and its component parts, and to the unseaworthy condition of the flywheel itself."

As conclusions of law, the court below found that "the defendant warranted that the flywheel in question contained no latent defect"; that delivery of the flywheel "with a latent defect in its casting constituted a breach of warranty by the defendant"; that the "latent defect in the fly-

wheel was the proximate cause of its disintegration on January 18, 1943."

Whitin made no express warranty that the flywheel was free of any "latent defect." This is conceded. But the court below held, and the government maintains, that Whitin made an implied warranty to that effect. Whitin contends that implied warranties are excluded by the terms of the contract, but for present purposes we shall assume that this is not so.

In this connection the government places its reliance upon c. 106, § 17, Mass.Gen. Laws (Ter.Ed.1932), which corresponds to § 15 of the Uniform Sales Act. We question whether the law of any particular state is applicable to a case of this kind, involving rights and liabilities under a contract with the United States; it may be that, in the absence of a controlling Act of Congress, the law to be applied is a general federal common law of sales, as formulated, ultimately, by the Supreme Court of the United States. See United States v. Bethlehem Steel Corp., 1942, 315 U.S. 289, 299, 62 S.Ct. 581, 86 L.Ed. 355; Clearfield Trust Co. v. United States, 1943, 318 U.S., 363, 63 S.Ct. 573, 87 L.Ed. 838; United States v. County of Allegheny, 1944, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209; United States v. Standard Oil Co., 1947, 332 U.S. 301, 305, 67 S.Ct. 1604, 91 L.Ed. 2067; Priebe & Sons, Inc. v. United States, 1947, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32. See also 43 Col.L.Rev. 520, 523 (1943); 34 Corn.L.Q. 110, 112 (1948); Note, 59 Harv.L.Rev. 966 (1946). But there is no reason to suppose that such federal common law would imply any warranties more extensive than those spelled out in the Uniform Sales Act. Hence we shall assume in the government's favor, without deciding, that the applicable law in the case at bar is the following provision of the Uniform Sales Act, as embodied in Mass.Gen.Laws, c. 106, § 17 (Ter.Ed. 1932):

"Section 17. There is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that they shall be of merchantable quality."

The flywheel in question was made of cast iron, in accordance with accepted commercial practice for flywheels on engines of this type, with a certain amount of steel added to the mixture in order to increase the tensile strength of the iron. The only "latent defect" in the flywheel suggested by the evidence is a certain condition of "porosity" referred to in the findings of the court below. But it is undisputed that there is a tendency to porosity in any casting, for the reason that as the molten metal cools and solidifies it contracts. In the words of one of Whitin's witnesses:

"I can best illustrate by an artificial cake of ice, in which you doubtless observe a light streak down through the center of the cake. That light streak is a porous condition existing in the center of that cake of ice. Now, that is caused by the surface, the outer surface of that cake of ice—I am going to refer to the cake of ice, because exactly the same condition exists in a casting—the outside surface of that cools first, and becomes solid, and as it cools it solidifies as the solid condition approaches the center of the cake; and as that solidifies, it draws or pulls away from the liquid remaining in the center part of the cake, with the result that when that freezes, which is the last portion which does freeze or solidify, there is not sufficient liquid remaining there to freeze in a perfectly solid condition."

This witness further testified:

"Unless that porosity happens to be so extensive that it extends to the surface of

the casting, there is no practical means of determining whether that condition exists except by cutting open the flywheel, and of course that is impractical, because that destroys the wheel."

He also stated that the porous condition makes no material difference because "the design of the flywheel and the strength of the material or cast iron produces a wheel which is far in excess of the strength required for any normal function that may be required of the flywheel. In designing the flywheel, a factor of safety of 10 is generally accepted as good practice, and that was the figure that was used in designing these wheels." The witness explained that "a factor of safety of 10" meant "that the strength of the wheel is 10 times as strong as is required for its normal operation." The normal operation for which the engine in question was designed was 400 to 440 r.p.m.

Another expert witness put the matter this way:

"A flywheel is designed to take into account the very factor that such weakness [i. e., porosity] does occur, and every flywheel, as far as I know, is made of cast iron or a cast-iron mixture, and in the design of a flywheel that very fact is taken into consideration, because it is inevitable in the course of manufacture. * * * A very liberal allowance is made for it. * * * A very liberal factor of safety. * * * Sometimes engineers call it a factor of ignorance,—trying to take into consideration inevitable conditions we know must occur, and providing for it by making it much stronger than we otherwise would have to do."

That the foregoing expert testimony was credited by the court below seems to be indicated by its findings of fact, as follows:

"The flywheels on the generator engines were designed and intended to have a safety factor of at least ten, which is the usual safety factor and was in the contemplation of the parties.

\* \* \* \* \* \*

"It was within the contemplation of the parties to the contract that the flywheels on the generator engines would be so constructed as to be able to withstand 440

RPM with a safety factor of ten without bursting."

The government has not contended that the flywheel was insufficient in strength to operate safely at speeds of 400 to 440 r.p.m. And indeed it appears that the wheel was able to withstand the centrifugal forces attendant upon a somewhat higher range of speed. The generator sets after installation in the S. S. Henry Bacon were given a running test by representatives of the United States Maritime Commission, one of whose inspectors reported that operations "of both generators and steam engines were satisfactory."

There was testimony that tests made by a Professor Benjamin of the breaking strength of cast iron flywheels of the same design as the flywheels manufactured by Whitin demonstrated that flywheels "with a tensile strength of 19,000 pounds per square inch, would not burst until they reached a speed in excess of 2600 revolutions per minute." Whitin made daily tests of samples taken at various times from the melts of metals that went into the flywheel castings to determine the chemical ingredients and breaking strength of the material. Records of the tests for the period during which the flywheel in question was manufactured were said to establish that the materials used showed "no deviation, no appreciable deviation from our standard practice. * * * Now, I might add to that, that instead of the iron from which these wheels were made having a strength of 19,000 pounds, it had a breaking strength, as shown by tests, daily tests, in excess of 28,000 pounds per square inch. Therefore it was 50% stronger than the iron from which Professor Benjamin made the wheels which he tested." It was further stated by the witness that the American Bureau of Ships' Manual "calls for flywheels and similar parts to be made with iron with a tensile strength of 20,000 pounds per square inch."

One expert witness, from the metallurgical laboratory of the American Bureau of Shipping, testified that he had examined pieces of the fractured flywheel, and that "there are parts of it that are not a sound casting. It has in the parts a very spongy and porous appearance, but tendency for

porosity is present in any casting." In response to a question whether the porosity he found was normal or excessive, he replied: "I would say it is *a little excessive.*" [Italics added.] He further said that "porosity is an indication of weakness, and the weaker or less strong the metal the lower bursting speed would be required to cause a failure." In contradiction of this testimony that the porosity in the recovered fragments of the flywheel was "a little excessive", expert witnesses produced by Whitin testified that they found the indications of porosity in no respect abnormal or excessive.

We think it clear that the government could not prevail in this suit if the flywheel which fractured had only a normal amount of porosity. Whitin certainly did not impliedly warrant that the flywheel would hold together no matter at what speed it was operated, for the testimony showed that every wheel has a bursting speed, that is, a rotational speed so great that the wheel cannot withstand the centrifugal forces created, and consequently disintegrates. On analysis, the asserted implied warranty upon which the government has recovered judgment below must have been taken to be, in effect, a warranty that there was not more than a normal amount of porosity in the flywheel. And despite contrary evidence introduced by Whitin, it may be assumed that the court below could properly have found (though it did not so find specifically) that a little more than the normal amount of porosity was present in the flywheel which fractured. Such must have been the "latent defect" which the court below found to have existed in the flywheel.

However, the only two implied warranties mentioned in the section of the Sales Act above quoted are (1) that the goods shall be reasonably fit for the particular purpose, and (2) that they shall be of merchantable quality.

The flywheel which fractured was "reasonably fit" for the particular purpose for which it was required. The use of the customary safety factor of 10 in the design of the flywheel insured its safe operation in the contemplated operating range of 400 to 440 r.p.m., and at somewhat high-

er speeds, even if the porosity was "a little excessive"; and the governor which was supplied was in part intended as a safeguard which would prevent the flywheel from reaching higher speeds where prediction was uncertain and performance hazardous. In short, precautions were adopted to make the contemplated operation of the flywheel safe, and the wheel was fit for such contemplated operation. The flywheel burst apart going at a speed immensely higher than the contemplated normal operating speed. The assumed "latent defect" in the casting, a "little excessive" porosity, was of no significance whatsoever except when the engine raced at speeds far beyond what was contemplated for "the particular purpose" for which the engine was required. Under the terms of the Sales Act, there was no implied warranty of the absence of such a "defect".

Not only was the flywheel fit for the purpose it was expected to serve; it was also "of merchantable quality", thus fulfilling the second implied warranty. "The requirement when it exists that goods shall be merchantable does not require that the goods shall be of first quality or even that they shall be as good as the average of goods of the sort. * * * the buyer cannot claim more than that the goods with their defects known shall be salable as goods of the general kind which they were described or supposed to be when bought". 1 Williston, Sales § 243 (Rev. ed. 1948). The government loosely contends that Whitin "impliedly warranted that the generator sets would be fit for use as generator sets on board such ships and that they would be of good construction and free from defects." However, since the presence here of the so-called "defect", porosity a little in excess of normal, destroyed neither merchantability nor fitness for the particular purpose contemplated, it affords no basis for the government's recovery.

"If the seller's performance fulfills his obligation in regard to the quality of goods, whether because he has made no promises or warranties in regard to their quality or because those which he did make have been fulfilled, no question can arise as to his liability." 3 Williston, Sales § 488 (Rev. ed. 1948). Since the so-called "de-

fect" in the flywheel which fractured did not constitute a violation of any express or implied warranty, no indemnitor-indemnitee relationship existed between Whitin and the United States with respect to the consequences of that defect.

The judgment of the District Court is reversed.