The LEITER MINERALS, INC., Appellant,

v.

UNITED STATES of America et al., Appellees.

No. 19963.

United States Court of Appeals Fifth Circuit.

March 3, 1964.

S. W. Plauche, Jr., Lake Charles, La., Tucker, Martin, Holder, Jeter & Jackson, John H. Tucker, Jr., H. M. Holder, Shreveport, La., Plauche & Plauche, Lake Charles, La., for The Leiter Minerals, Inc., defendant-appellant.

Eugene D. Saunders, New Orleans, La., H. M. Holder, Shreveport, La., Milling, Saal, Saunders, Benson & Woodward, Charles D. Marshall, New Orleans, La., for The California Co. and individual appellees.

Kathleen Ruddell, Asst. U. S. Atty., New Orleans, La., Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., C. D. Marshall, Louis C. LaCour, U. S. Atty., New Orleans, La., for appellees.

Before RIVES and GEWIN, Circuit Judges, and SHEEHY, District Judge.

RIVES, Circuit Judge.

The question presented is the right to mine and remove oil, gas, and other minerals from about 8711 acres of land in Plaquemines Parish, Louisiana, a right worth many millions of dollars. The mineral right was established in a deed dated December 21, 1938 from Thomas Leiter conveying the lands to the United States, and reserving the right to the minerals as follows:

> "The Vendor reserves from this sale the right to mine and remove, or to grant to others the right to

mine and remove, all oil, gas and other valuable minerals which may be deposited in or under said lands, and to remove any oil, gas or other valuable minerals from the premises; the right to enter upon said lands at any time for the purpose of mining and removing said oil, gas and minerals, said right, subject to the conditions hereinafter set forth, to expire April 1, 1945, it being understood, however, that the vendors will pay to the United States of America, 5% of the gross proceeds received by them as royalties or otherwise from all oil or minerals so removed from in or under the aforedescribed lands, until such time as the vendors shall have paid to the United States of America, the sum of $25,000 being the purchase price paid by said United States of America for the aforedescribed properties.

"Provided, that if at the termination of the ten (10) year period of reservation, it is found that such minerals, oil and gas are being operated and have been operated for an average of at least 50 days per year during the preceding three (3) year period to commercial advantage, then, and in that event, the said right to mine shall be extended for a further period of five (5) years, but that the right so extended shall be limited to an area of twenty-five acres of land around each well or mine producing, and each well or mine being drilled or developed at time of first extension, to-wit: April 1, 1945.

"Provided, that this said right to mine as previously stated shall be further extended from time to time for periods of five (5) years whenever operation during the preceding five (5) year period has been for an average of 50 days per year during this period, and

"Provided that at the termination of the ten (10) year period of reservation, if not extended, or at the termination of any extended period in case the operation has not been carried on for the number of days stated, the right to mine shall terminate, and complete fee in the land become vested in the United States.

"The reservation of the oil and mineral rights herein made for the original period of ten (10) years and for any extended period or periods in accordance with the above provisions shall not be affected by any subseqeunt conveyance of all or any of the aforementioned properties by the United States of America, but said mineral rights shall, subject to the conditions above above (sic) set forth, remain vested in the vendors."

The appellant, Leiter Minerals, Inc., hereafter Leiter, is the successor in interest to the right reserved by Thomas Leiter, and bases its claim upon that reservation. It concedes that no minerals have ever been produced by either Thomas Leiter or any successor in interest to the right established by that reservation. The United States issued four oil and gas leases to Frank J. Lobrano and Allen Lobrano, who entered into operating agreements with The California Company, hereafter California. California completed the first producing well in January 1950. By May of 1954, 80 wells were producing, under which the royalty paid to the United States had then exceeded $3,500,000.00.

Under the terms of the reservation, it would be clear that the right to mine terminated and complete fee in the land became vested in the United States but for the possible operation on the mineral right of two Louisiana statutes. Act No. 151 of 1938, in existence at the date of the deed, provided:

" * * * That when real estate is acquired by the United States of America, the State of Louisiana, or any of its subdivisions, from any person, firm or corporation for use in any public work and/or improvement, and, by the act of acquisition, oil, gas and/or other minerals or

royalties are reserved, prescription shall not run against such reservation of said oil, gas and/or other minerals or royalties."

That Act was repealed by Act 315 of 1940, LSA–R.S. 9:5806, which provides:

" * * * That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation, and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible."

The ownership of the mineral right depends upon whether the mineral reservation provided for a contractual prescription for the conditional extinguishment of the mineral servitude which was rendered inoperative by the Louisiana statutes.

The first suit was filed in a Louisiana state court on August 13, 1953 by Leiter, against California and Allen L. Lobrano. The United States then filed in the federal district court the present action to quiet title, asserting its right to the minerals. The district court granted a preliminary injunction enjoining Leiter from prosecuting the state court action.[1] This Court affirmed.[2] On certiorari, the Supreme Court modified the judgment of this Court to permit an interpretation of the Louisiana statute involved to be sought with every expedition in the Louisiana courts, saying:

"The Government contends that Act No. 315 of 1940 does not apply when the parties themselves have contracted for a reservation of specific duration and that if the statute is construed to apply to this situation, it would impair the obligation of the Government's contract. Petitioner disagrees. The Supreme Court of Louisiana has never considered the specific issue or even discussed generally the rationale of the statute, especially with reference to problems of constitutionality. The District Court recognized the importance of the statute in deciding this case; it also recognized that a problem of interpretation was involved, that the statute cannot be read by him who runs. What are the situations to which the statute is applicable? Is the statute merely declaratory of prior Louisiana law? What are the problems that it was designed to meet? The answers to these questions are, or may be, relevant. Before attempting to answer them and to decide their relation to the issues in the case, we think it advisable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court. The Louisiana declaratory judgment procedure appears available to secure such an interpretation, La.Rev.Stat., 1950, 13:4231 et seq., and the United States of course may appear to urge its interpretation of the statute. See Stanley v. Schwalby, 147 U.S. 508, 512–513 [13 S.Ct. 418, 37 L.Ed. 259]. It need hardly be added that the state courts in such a proceeding can decide definitively only questions of state law that are not subject to overriding federal law.

"We therefore modify the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion."

1. Opinion reported as United States v. Leiter Minerals, Inc., E.D.La.1954, 127 F.Supp. 439.

2. Leiter Minerals, Inc. v. United States, 5 Cir. 1955, 224 F.2d 381.

Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 229, 230, 77 S.Ct. 287, 292, 293, 1 L.Ed.2d 267. The Louisiana courts rendered three published opinions, the last of which is presently of most importance.[3] The Supreme Court of Louisiana summarized its advice to the federal courts as follows:

"To summarize in conclusion, it is our view, and we hold: First, that if the reservation in the Leiter deed is construed as establishing a mineral servitude for a definite, fixed, and specified time which has elapsed, then Act 315 of 1940 is not applicable and cannot be constitutionally applied; and second, that if the reservation is construed as not establishing a servitude for a fixed, definite and certain time, and if it is decided that the provisions of the reservation show that the parties were stipulating for a period of contractual prescription for the conditional extinguishment of the mineral servitude created, then Act 315 of 1940 is applicable and constitutional. The interpretation of the contract is for the United States courts."

Leiter Minerals, Inc. v. California Co., La.1961, 241 La. 915, 132 So.2d 845, 854, 855.

The federal district court then granted summary judgment in favor of the United States.[4] This appeal is from that judgment.

The United States argues that the deed is explicit that under the admitted circumstances the right was "to expire" and "the right to mine shall terminate, and complete fee in the land become vested in the United States"; that such a contract is valid under federal law; and that the rights of the United States under the deed are governed by federal law, citing Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573,

87 L.Ed. 838; United States v. Allegheny County, 1944, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209; Ivanhoe Irr. Dist. v. McCracken, 1958, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313; Girard Trust Co. v. United States, 3 Cir. 1945, 149 F.2d 872, 874; Whitin Machine Works v. United States, 1 Cir. 1949, 175 F.2d 504, 507; United States v. Jones, 9 Cir. 1949, 176 F.2d 278, 281.

The land was acquired by the United States in order to establish the "Delta Migratory Waterfowl Refuge," pursuant to the authority of the Migratory Bird Conservation Act, 16 U.S.C.A. § 703 et seq. Sections 715d and 715e authorize the Secretary of the Interior (1) to purchase or rent appropriate areas for migratory bird sanctuaries; (2) to do all things necessary to make such acquisitions; and provide, (3) that no such acquisitions by the United States shall "be defeated because of rights-of-way, easements, and reservations which * * will in the opinion of the Secretary * * in no manner interfere with the use of the areas so encumbered"; and (4) that such rights-of-way, easements, and reservations shall be subject to such regulations as the Secretary shall prescribe, and "it shall be expressed in the deed or lease that the use, occupation, and operation of such rights-of-way, easements, and reservations shall be subordinate to and subject to such rules and regulations as are set out in such deed or lease," or if deemed necessary by the Secretary to such rules and regulations as may be prescribed by him.

In addition, section 715f of the Migratory Act reads:

"No deed or instrument of conveyance shall be accepted by the Secretary of the Interior under sections 715–715d, 715e, 715f–715k, and 715l–715r of this title *unless the State in which the area lies shall have consented by law to the acquisi-*

3. Leiter Minerals, Inc. v. California Co., 1960, 239 La. 116, 118 So.2d 124; Leiter Minerals, Inc. v. California Co., Ct.App. La. 4th Cir., 1961, 126 So.2d 76; Leiter Minerals, Inc. v. California Co., La. 1961, 241 La. 915, 132 So.2d 845.

4. United States v. Leiter Minerals, Inc., E.D.La.1962, 204 F.Supp. 560.

*tion by the United States of lands in that State."* (Emphasis added.)

█ We have no doubt that the Congress could make federal law applicable, but we are equally clear that it had no intention to do so when it merely authorized the contract by which the United States acquired the property. State law must govern in the absence of a federal statute making federal law applicable. United States v. Certain Property, etc., 2 Cir. 1962, 306 F.2d 439, 444, 445.

█ In effect, that is the teaching of the rules of decision act.[5] While this is not a diversity case controlled by the Erie doctrine (Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188), the rules of decision act always has had "application to state laws, strictly local, that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intra-territorial in their nature and character." Swift v. Tyson, 1842, 41 U.S.(16 Pet.) 1, 18, 10 L.Ed. 865. As to such matters, in the absence of a controlling decision by the highest court of the State, we should be guided by the best evidence available. In the classical language of Mr. Justice Cardozo, speaking for the Supreme Court in Hawks v. Hamill, 1933, 288 U.S. 52, 59, 60, 53 S.Ct. 240, 242, 77 L.Ed. 610:

"At least it is a considered dictum, and not comment merely *obiter*. It has capacity, though it be less than a decision, to tilt the balanced mind toward submission and agreement. * * * In controversies so purely local, little gain is to be derived from drawing nice distinctions between dicta and decisions. Disagreement with either, even though permissible, is at best a last resort,

to be embraced with caution and reluctance. The stranger from afar, unacquainted with the local ways, permits himself to be guided by the best evidence available, the directions or the counsel of those who dwell upon the spot."

█ On " * * * questions of state law that are not subject to overriding federal law * * * " (352 U.S. 230, 77 S.Ct. 293, 1 L.Ed.2d 267), the opinions of the Louisiana state courts, rendered in response to the suggestion of the Supreme Court (352 U.S. 229, 230, 77 S.Ct. 287, 1 L.Ed.2d 267) are all highly instructive, and the opinion of the State Supreme Court is controlling.

The State district court, Judge Bruce Nunez, entered judgment in favor of Leiter pursuant to an opinion which was adopted by Supreme Court Justice Hamlin as his dissent and is published in 132 So.2d at pp. 856–860. In part, Judge Nunez said:

" 'In 1938, when Leiter sold to the government and reserved the mineral rights, the government had no assurance that the mineral rights would not be forever preserved to the vendor. The government's right to become thereafter vested with the ownership of the minerals, depended entirely on the uncertain future. The contract contained specific provisions which would have permitted Leiter to maintain his mineral rights forever, or at least indefinitely. It is this Court's considered opinion that what the parties did in 1938 was to establish, in a mode not prohibited by law or public policy, a conventional or contractual prescription as to the mineral rights and when the Legislature passed Act 315 a year and a half later, those mineral rights were still in effect. Likewise, at the time the Legislature passed the 1940 Act the govern-

---

5. "§ 1652. *State laws as rules of decision*
 "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress other-

wise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C.A. § 1652.

ment's rights to the minerals were just as contingent and uncertain as they were when Leiter executed the deed in 1938." (132 So.2d at p. 859.)

The State Court of Appeals took a diametrically opposite view, and "declared and decreed that Act 315 of 1940 (LSA–R.S. 9:5806) does not apply in this case since the mineral reservation is of specific ex contractu duration, less than the prevailing statutory period of ten years for non-user." (126 So.2d at 82.)

Mr. Justice Hawthorne, speaking for the majority of the Supreme Court of Louisiana, thought that both the Louisiana district court and the Louisiana Court of Appeals went too far, and that they should have confined their opinions to an interpretation of the Louisiana statute:

"As we view the matter, both the Louisiana district court and the Louisiana Court of Appeal went far beyond the directive of the United States Supreme Court, as our state courts were not asked to interpret or construe the reservation of the mineral rights in the deed to the United States." (132 So.2d at p. 850.)

It nonetheless seems clear that the majority of the Supreme Court of Louisiana held the opinion that when the entire reservation was read together and in context, Leiter's servitude was one of indefinite duration. It disagreed flatly with the opinion of the Louisiana Court of Appeals and, continuing the paragraph of its opinion last quoted, said:

"In this connection, however, we cannot help but observe that the Court of Appeal in reaching its conclusion did not consider the entire reservation but concentrated its whole attention on a single date in it. In this it was in error, for under Article 1955 of our Civil Code 'All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act'. For this reason the

decision of the Court of Appeal on this point should not be given any weight." (132 So.2d at p. 850.)

In another part of its opinion, the Supreme Court of Louisiana said:

"An example of a servitude established for a certain time (a servitude of specific duration) is that created by the mineral reservation in the case of Hodges v. Norton, 200 La. 614, 8 So.2d 618. Counsel for the government's lessees argue that the mineral reservation in that case is similar to the reservation in the Leiter deed. For what it may be worth, our opinion is that it is not." (132 So.2d at p. 852.)

We agree that, since the United States had the right to invoke federal jurisdiction (28 U.S.C.A. § 1345), the ultimate responsibility for the interpretation of the reservation rests upon the federal courts. That interpretation, however, must be in accordance with State law; and the opinions of the State courts, and especially of the State Supreme Court, are entitled to the most earnest and respectful consideration. While the State Supreme Court undertook to confine its opinion to the interpretation of the State statute, it was proper and inevitable that it do so "in light of" the reservation to which that statute might apply. See England v. Louisiana State Board of Medical Examiners, et al., 1964, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440.

After careful consideration, we find ourselves in full agreement with the Supreme Court of Louisiana. The federal district court observed that: " 'Contractual prescription' is, at best, an odd notion." (204 F.Supp. 567.) The notion, however, appears to us consistent with the concept of a private law between the parties embodied in the provisions of the LSA–Civil Code that, "agreements legally entered into have the effect of laws on those who have formed them," Article 1901; and, again, "legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them," Article 1945.

That last expression is, of course, not intended to deny any power of the Louisiana Legislature to render an agreement inoperative, for in this case the Louisiana Supreme Court has advised as to Act 315 of 1940 that:

"The act draws no distinction between statutory and contractual prescription, and, as we view the matter from the history of the act and the objects and purposes for which it was adopted, it is manifest that the Legislature intended the act to be applicable to prescription whether established by statute or by contract where prescription had not already accrued at the time the act became effective." (132 So.2d at p. 854.)

The Louisiana Supreme Court cites as kinds of servitude which may not be affected by prescription, those which meet the tests of Article 821,[6] or of Article 783(6) [7] of the Civil Code of Louisiana (132 So.2d at 852).

Whether the parties stipulated for a period of contractual prescription must be determined from their viewpoint as of the time they entered into the contract. That is shown by the words "have been established" in Civil Code Article 821, note 6, supra, and is recognized in the Louisiana Supreme Court's summary of its holdings which we have quoted, and at other places in the opinion of the Louisiana Supreme Court, e. g.:

"Where mineral rights in lands sold to the United States government are reserved for a certain, definite, and fixed time in the contract, or, in other words, where the servitude has been established for a certain or fixed time, at the expiration of the time fixed the servitude is lost or extinguished; and since in such a case there is no question of prescrip-

tion, Act 315 of 1940 is without application." (132 So.2d at p. 853.)

Under that language, it seems clear that "a certain time only" as used in Article 821 means "a certain definite and fixed time." Louisiana Civil Code, Articles 2048 and 2049 make it equally clear that "certain event" means an event which in the course of nature is certain to occur.

"Art. 2048. The time given or limited for the performance of an obligation, is called its *term.*"

"Art. 2049. A term may not only consist of a determinate lapse of time, but also of an event, provided that event be in the course of nature, certain; if it be uncertain, it forms a condition."

The first paragraph of the reservation provided: " * * * the right to enter upon said lands at any time for the purpose of mining and removing said oil, gas and minerals, said right, subject to the conditions hereinafter set forth, to expire April 1, 1945 * * *."

But for the words "subject to the conditions hereinafter set forth" the servitude would have been established "for a certain time only." The first condition was expressed in the next paragraph, as follows:

" * * * if at the termination of the ten (10) year period of reservation, it is found that such minerals, oil and gas are being operated and have been operated for an average of at least 50 days per year during the preceding three (3) year period to commercial advantage, then, and in that event the said right to mine shall be extended for a further period of five (5) years, but that the right so extended shall be limited to an area of twenty-five acres of

---

6. "Art. 821. Servitudes are also extinguished when they have been established for a certain time only, or under a condition that in a certain event they shall cease; for when the time expires, or the event takes place, the servitude becomes extinguished of right." 3 LSA-C.C. Title 4.

7. "Art. 783. Servitudes are extinguished:
" * * *
"6. By the expiration of the time for which the servitude was granted, or by the happening of the dissolving condition attached to the servitude." 3 LSA-C.C. Title 4.

land around each well or mine producing, and each well or mine being drilled or developed at time of first extension, to-wit: April 1, 1945."

It seems to us inescapable that that condition made the period for which the servitude was established indefinite and uncertain. At the time the parties entered into the contract it could not be known whether that condition would be met. The event was not "in the course of nature, certain".[8]

Successive conditions, likewise indefinite and uncertain, are provided in the succeeding paragraph:

" * * * said right to mine as previously stated shall be further extended from time to time for periods of five (5) years whenever operation during the preceding five (5) year period has been for an average of 50 days per year during this period * * *."

At the time the servitude was established, it might extend, according to the contract, for 10 years, 15 years, 20 years or until the minerals were exhausted. The district court properly commented that, "[t]he Louisiana Supreme Court itself has told us that an 'uncertain and indefinite duration' is the hallmark of prescription," and continued, "Here the hallmark is missing." (204 F.Supp. at p. 567.) We cannot agree, but think that here the hallmark is inescapably present.

The district court pointed out many ways in which the "periods of reservation" differed from statutory prescription:

" * * * There are other essential differences between the effect of these provisions and the rules of liberative prescription. These may be summarized:

"First, under the present contract, *a large area will be released* from the servitude after the expiration of ten years *regardless of use or pro-* *duction,* for only 25 acres around each well are saved in any event.

"Second, no use of the servitude short of *actual production in paying quantities for at least fifty days a year for three years* will preserve any part of the servitude beyond the primary term.

"Third, only production in the *last three years* of the primary term will renew the servitude.

"Fourth, even the requisite production at the right time will renew the servitude for *only five additional years.*

"These are not the characteristics of legal prescription, nor of any known contractual variant." (204 F.Supp. at pp. 566, 567.)

 There would be no need to recognize contractual prescription if it had to conform to statutory prescription. Art. 1764 of the LSA–Civil Code provides, in part, that, "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts * * *." Thus, Louisiana provides for the utmost liberty to contract. We can see no reason why the contracting parties were not at liberty to prescribe the type of user which will overcome the presumption of abandonment and to require that it be a successful user. See Keebler v. Seubert, 1929, 167 La. 901, 120 So. 591, 592. We conclude that the district court erred in holding that the reservation in the deed did not provide for a contractual prescription for the conditional extinguishment of the mineral servitude which was rendered inoperative by the Louisiana statutes.

 Appellees insist, however, that if the Louisiana statutes are so applied they would be unconstitutional because they would impair the obligations of the contract. Article I, Section 10 of the Constitution provides that, "No state shall * * * pass any * * * law impairing the obligation of contracts." The Constitution of Louisiana contains a sim-

---

8. Art. 2049 of LSA–Civil Code.

ilar provision, as to which the Supreme Court of Louisiana held: "Act 315 of 1940 does not violate Article 4, Section 15, of the Louisiana Constitution of 1921, which provides that vested rights shall not be divested and that no law impairing the obligation of contracts shall be passed." (132 So.2d at p. 854.) The reasoning upon which that holding was based seems to us sound and to apply with equal force to the like provision of the Constitution of the United States. That discussion, together with the full discussion of the constitutionality of Act 315 of 1940 contained in this Court's opinion in United States v. Nebo Oil Co., 5 Cir. 1951, 190 F.2d 1003, 1009, 1010, make it unnecessary further to labor the constitutional question.

That is even more clear when we consider that the contract may not have become legally binding until it was ratified and adopted by Thomas Leiter on October 24, 1938, after Act No. 151 of 1938 had been passed. Theretofore the contract of March 14, 1935 had been executed only by the executors and trustees under the will of Joseph Leiter without any court authority, and though a space was provided for the execution of the agreement on behalf of the United States by the Secretary of Agriculture, it had never been so executed. Thomas Leiter's ratification recites that, " * * * on June 27, 1935, the United States of America mailed a notice of acceptance 'of the aforesaid offer to Mr. C. J. Tessier, 217 Carondelet Street, New Orleans, Louisiana, accepting the option above described on the terms and provisions stipulated therein' * * *." Mr. Tessier's authority or connection with the title does not otherwise appear from the record. It does appear, however, that on October 18, 1935 the Executors and Trustees under the will of Joseph Leiter executed a grant of preliminary use and occupation "in order that the United States may immediately establish the Delta Migratory Waterfowl Refuge by Executive Order." Under that permis-

sion, the United States entered into possession in 1936 and surveyed and mapped the area during the Winter of 1936–1937.

It is thus doubtful whether the contract became legally binding prior to the passage of Act No. 151 of 1938. Upon the assumption, however, that it became binding on its date, March 14, 1935, we hold there is no constitutional obstacle to the application of the Louisiana statutes—Act No. 151 of 1938 or Act No. 315 of 1940.

The judgment of the district court is therefore reversed and the cause remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

GEWIN, Circuit Judge (dissenting).

After carefully considering the brilliant, clear and well-written opinion of the majority, I find myself more in agreement with the opinion of the District Court [1] than with the majority opinion. Accordingly, I would adhere to the result and the conclusions reached by the District Court.

It appears to me that the majority opinion is not correct in holding that the mineral reservation provided for a contractual prescription for the *conditional* extinguishment of the mineral servitude which was rendered inoperative by the Louisiana statutes, which is to say, that there were conditions or a condition set forth in the contract which made the period for which the servitude was established indefinite and uncertain. The reservation was not of indefinite duration in my view, but was for a definite, fixed and specified time which elapsed on December 21, 1948,[2] before the Government executed its lease and before the discovery of oil.

The contract did not provide for a *conditional extinguishment*, but actually provided for a *conditional partial renewal*. The renewal conditions were not met during the initial 10 year period, and only the occurrence of those uncer-

---

1. United States v. Leiter Minerals, Inc. (D.C.E.D.La.1962) 204 F.Supp. 560.

2. See note 26 of the District Court's opinion reported in 204 F.Supp. 560.

tain conditions would have renewed or extended the definite, fixed initial period of 10 years. The term of the servitude is definite. The right of renewal or extension is conditional and indefinite. In addition to the foregoing, as clearly pointed out by the District Court and noticed by the majority, a large area of the property would be released from the servitude inevitably, regardless of what took place.

I would affirm the judgment of the District Court.